**IT IS ORDERED as set forth below:**

Date: December 21, 2018

_____
**Wendy L. Hagenau**
**U.S. Bankruptcy Court Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 15-64266-WLH |
| CLAYTON GENERAL, INC., f/k/a SOUTHERN REGIONAL HEALTH SYSTEM, INC., d/b/a SOUTHERN REGIONAL MEDICAL CENTER, et al., | CHAPTER 11 |
| Debtor. | |
| GGG PARTNERS, LLC, Liquidating Trustee of Clayton General Liquidating Trust, | ADVERSARY PROCEEDING NO. 17-5198-WLH |
| Plaintiff, | |
| v. | |
| ATLAS HEALTH CARE LINEN SERVICES, CO., LLC, a/k/a ALLIANCE LAUNDRY AND TEXTILE SERVICE OF ATLANTA, d/b/a CLARUS LINEN SYSTEMS, | |
| Defendant. | |

1

**ORDER DENYING SUMMARY JUDGMENT**

**THIS MOTION** is before the Court on Defendant's Motion for Summary Judgment (Doc. No. 28) (the "Motion"). Defendant seeks summary judgment based on two affirmative defenses: the ordinary course of business defense set forth in section 547(c)(2) of the Bankruptcy Code, and the new value defense set forth in section 547(c)(4) of the Bankruptcy Code.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(1), and the causes of action set forth in this adversary proceeding involve the avoidance and recovery of payments made to the Defendant pursuant to 11 U.S.C. §§ 547 and 550 and are "core" proceedings pursuant to 28 U.S.C. § 157(b)(2)(F).

**I.    FACTS**

The Debtors were a family of healthcare providers servicing residents of Clayton County, Georgia and others throughout the Atlanta metro area through hospital, outpatient clinic, and ambulatory care services. Defendant is a provider of linen related products and services to medical facilities, including physician offices, surgery centers, clinics, healthcare centers, and nursing homes, across the United States.

On July 30, 2010, one of the Debtors, Southern Regional Medical Center, entered into an agreement with the Defendant for Defendant to provide linen products to Southern Regional Medical Center's healthcare facilities and to deliver, pick up, and launder the linens. Debtors were generally invoiced on a weekly basis, on the last day of a particular week, for which services were provided. The agreement stipulated that payment for services was due Net 30 from the date of the invoice; the invoices issued to the Debtors also provided payments for services were due 30 days

from the date of the invoice. From 2013-2015, Debtors provided linens and related services to the Debtors and invoiced the Debtors for such services; Debtors regularly paid Defendant by check.

During the ninety days prior to the petition date (the "Preference Period"), the Debtors made ten payments to Defendant between May 26, 2015 and July 28, 2015 totaling $183,083.33 (the "Transfers"). The Transfers were made by checks payable to the Defendant for various invoices for services provided by the Defendant. Appendix D to the Motion lists the transfers, dates of payment, invoice numbers, invoice dates, and invoice amounts.

On July 30, 2015, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On July 28, 2017, the Debtors[1] filed a complaint alleging the Transfers constitute preferential transfers pursuant to section 547 of the Bankruptcy Code.

Defendant filed the Motion asserting summary judgment should be granted in its favor as a matter of law because there is no dispute of material fact. Defendant contends, even if the Transfers were preferential, the Transfers were made in the ordinary course of business and, therefore, are not avoidable pursuant to section 547(c)(2)(B). Defendant also argues, in the event some of the Transfers were not made in the ordinary course of business, that it supplied new value to the Debtors after receiving the Transfers and the Transfers are therefore not avoidable pursuant to section 547(c)(4).

Plaintiff responded to and opposes the Motion. Plaintiff asserts Defendant engaged in unusual collection activity during the preference period, which precludes a finding that the

---

[1] On the September 1, 2018, pursuant to the terms of the Debtors' First Amended Joint Plan of Liquidation, all of the assets of the Debtors, including all causes of action belonging to the Debtors, were transferred to the Clayton General Liquidating Trust, and the Plaintiff was appointed as the liquidating trustee. Given that Plaintiff succeeded to the causes of action set forth in this adversary proceeding in its role as trustee of the Trust, the Court entered a consent order substituting Plaintiff as the party plaintiff in this adversary proceeding (Doc. No. 26).

3

payments were in the ordinary course of business, and disputes Defendant's calculation of new value.

For the reasons set forth below, the Court finds there are genuine factual disputes precluding summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056(c). "The substantive law [applicable to the case] will identify which facts are material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden of proving there are no disputes as to any material facts. Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 918 (11th Cir. 1993). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The party moving for summary judgment has "the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any' which it believes demonstrate the absence of a genuine issue of material fact." U.S. v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (*citing* Celotex Corp., 477 U.S. at 323). What is required of the moving party, however, varies depending on whether the moving party has the ultimate burden of proof on the issue at trial. Once this burden is met, the nonmoving party cannot merely rely on allegations or denials in its own pleadings. *See* Fed. R. Civ. P. 56(e). Rather, the nonmoving party must present specific facts that demonstrate there is a genuine dispute over

4

material facts.  Hairston, 9 F.3d at 918.  When reviewing a motion for summary judgment, a court must examine the evidence in the light most favorable to the nonmoving party and all reasonable doubts and inferences should be resolved in favor of the nonmoving party.  Id.

### III. ANALYSIS

Plaintiff alleges the Transfers constitute preferential transfers pursuant to section 547 of the Bankruptcy Code.  Section 547(b) authorizes a trustee to "avoid any transfer of an interest of the debtor in property" as a preferential transfer under certain conditions. 11 U.S.C. § 547(b).  A preferential transfer is one "that enables a creditor to receive payment of a greater percentage of his claim against the debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankrupt estate."  Union Bank v. Wolas, 502 U.S. 151, 160–61 (1991).  The purpose of the Bankruptcy Code's preferential transfer provisions is twofold: primarily, the goal is to "facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor," and a secondary aim is to discourage creditors from "racing to the courthouse to dismember the debtor during his slide into bankruptcy."  Id. at 161.

To successfully avoid the Transfers as preferential under 547(b), Plaintiff must prove five elements: it must prove that the Transfers were (1) "to or for the benefit of a creditor," (2) "for or on account of an antecedent debt owed by the debtor before such transfer was made," (3) "made while the debtor was insolvent," (4) "made on or within 90 days before the date of the filing of the petition," and that it (5) enabled the defendant to receive more than it would have received in a hypothetical Chapter 7 liquidation if the transfer had not been made.  11 U.S.C. § 547(b).  The Defendant does not dispute the Plaintiff has satisfied these elements and set out a prima facie case for avoidance of the Transfers.  The Defendant, however, relies on certain statutory defenses.

5

Section 547(c) of the Bankruptcy Code provides several exceptions to the trustee's ability to avoid transfers as preferential including two at issue here: section 547(c)(2) prevents a trustee from avoiding a transfer made in the ordinary course of business or financial affairs of the debtor and the transferee or made according to ordinary business terms, and section 547(c)(4) prevents a trustee from avoiding a transfer to a creditor from a debtor to the extent that the creditor gave new value to, or for the benefit of, the debtor after the transfer.

### a. Ordinary Course

Section 547(c)(2), commonly known as the "ordinary course of business" exception, prevents a trustee from avoiding a transfer

> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was –
>
> > (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
> >
> > (B) made according to ordinary business terms.

11 U.S.C. § 547(c)(2). The goal of this exception is to "leave undisturbed normal financial relations." H.R. Rep. No. 95–595, at 373, U.S. Code Cong. & Admin. News 1978, p. 6329. In other words, the debt must have been incurred in the ordinary course, but the repayment may have been made either in the ordinary course or according to ordinary business terms. This exception is in the nature of an affirmative defense, so the Defendant has the burden of proving its elements. 11 U.S.C. § 547(g).

There is no dispute the Transfers were in payment of debts the Debtors incurred in the ordinary course of their financial affairs within the meaning of section 547(c)(2). The issue is whether the Transfers were either (1) "made in the ordinary course of business or financial affairs of the debtor and the transferee," or (2) "made according to ordinary business terms." 11 U.S.C.

6

§ 547(c)(2)(A) & (B). The first of these tests is commonly known as the subjective test— focusing on what happened between the relevant debtor and creditor—and the second is known as the objective test—focusing on what typically happens with most debtors and creditors in the relevant industry. As originally enacted, this Bankruptcy Code subsection was written in the conjunctive and required the defendant to prove that the debt was repaid both in the ordinary course of affairs between the debtor and creditor *and* according to ordinary business terms. When Congress amended the Bankruptcy Code in 2005, it eased the burden on defendants by requiring them to only satisfy one of these two elements. *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Title IV, § 409, 119 Stat 23 (April 20, 2005).

### i. There is a Genuine Issue of Material Fact Whether the Transfers Were Made in the Ordinary Course of Business or Financial Affairs of the Debtors and the Defendant (Subjective)

Under section 547(c)(2)(B), a payment must be "made in the ordinary course of business or financial affairs of the debtor and the transferee" in order to qualify for the ordinary course defense to the trustee's recovery of the transfer as a preference under § 547(b). The Congressional purpose underlying the ordinary course of business defense in section 547(c)(2) is to protect "those payments which do not result from 'unusual' debt collection or payment practices." In re Craig Oil Co., 785 F.2d 1563, 1566 (11th Cir. 1986). In determining whether transfers occurred in the ordinary course of business of the debtor and the transferee within the meaning of section 547(c)(2)(B), "the issue is whether the transfers in question were made in a similar manner to transfers made prior to the preference period. The factor to focus upon is whether the payment(s) were made in response to unusual debt collection or payment practices." Scroggins v. BP Exploration & Oil (In re Brown Transp. Truckload, 161 B.R. 735, 739-40 (Bankr. N.D. Ga. 1993).

7

In order to prove the Transfers were made in the ordinary course of the financial affairs of the debtor and the transferee—the Defendant must demonstrate that they had "some consistency with other business transactions between the debtor and the creditor." In re Magic Circle Energy Corp., 64 B.R. 269, 273 (Bankr. W.D. Okla. 1986). This involves an analysis into "other dealings between *that* creditor and *that* debtor." Carrier Corp. v. Buckley (In re Globe Mfg. Corp.), 567 F.3d 1291, 1298 (11th Cir. 2009) (emphasis in original). In making this determination, courts have considered various factors, including: (1) the length of time the parties have had a business relationship; (2) whether the subject transfer was higher than the amount usually paid; (3) the timing and method of payments; (4) any unusual collection activity by the creditor; and (5) whether the creditor did anything to gain an advantage (such as additional security) in light of the debtor's deteriorating finances. Marathon Oil Co. v. Flatau (In re Craig Oil Co.), 785 F.2d 1563 (11th Cir. 1986).

The issue is essentially whether the transfers in question were made in a similar manner to transfers made prior to the preference period. Late payments can be considered ordinary if the transferee shows that late payments were the normal course of business between the parties. *See* Ellenberg v. Plaid Enters. (In re Home Sewing Enters.), 173 B.R. 790, 796 (Bankr. N.D. Ga. 1993); In re Fred Hawes Organization, Inc., 957 F.2d 239, 244 (6th Cir. 1992). In this regard, the transferee must establish a "'baseline of dealings' so that the court may compare the practice of late payments during the preference period with the prior course of dealing." Ellenberg, 173 B.R. at 795-96; *see also* Glass v. Isotec Int'l, Inc. (In re Southwest Rec. Indus.), Adv. Pro. No. 05-4066, 2008 Bankr. LEXIS 1398, *21 (Bankr. N.D. Ga. Mar. 27, 2008).

Defendant contends the Transfers were made in the ordinary course of business of the Debtors and the Defendant. Plaintiff disagrees; it argues the Transfers were the result of unusual

8

payment activities and were outside the typical average repayment period during the pre-Preference Period. The parties dispute: 1) whether the timing and method of payment of the Transfers were similar to the timing and method of payments before the Preference Period; and 2) whether the Defendant engaged in any unusual collection or payment activities.

### 1. There is a Dispute if the Transfers Were Made in a Manner and Time Frame Similar to the Timing and Method of Payments Before the Preference Period

Defendant contends Debtors paid Defendant during the Preference Period in a manner and time frame similar to that used before the Preference Period; Plaintiff disagrees.

Payments made during the preference period do not have to "possess a rigid similarity to each past transaction"; however, there must be "some consistency." Menotte v. Oxyde Chem., Inc. (JLS Chem. Corp.), 424 B.R. 573, 581 (Bankr. S.D. Fla. 2010). "[T]here is no single formula the [c]ourt must use" when deciding whether the timing and method of payments were made in the ordinary course of business. Id. A variety of mathematical processes that include the range, averages, and weighted percentages may be appropriate. Moltech Power, 327 B.R. at 681 ("[T]he court may use any or all of these mathematical methods as tools by which to determine what the ordinary course of business between the parties actually was.") (internal citations omitted).

Defendant contends there was no significant shift in the average time of repayment during the Preference Period – according to Defendant, the total number of days from invoice receipt date to payment date during the Preference Period did not vary significantly from the average days to pay during the pre-Preference Period. Defendant states the invoice to payment date average before the Preference Period was 137 days compared to 122 days during the Preference Period and that the difference is not significant. Defendant further states a majority of payments both before and during the Preference Period were made more than ninety days after the invoice date. Defendant

9

contends payments made during the Preference Period were in line with when payments were made during the pre-Preference Period.

Plaintiff argues the Preference Period payment history is inconsistent from the dealings between the parties during the historical baseline. It contends the Debtors began paying invoices much more quickly during the Preference Period – the average days to pay dropped from 149 days to 121 days with all invoices paid within 143 days of issuance, whereas nearly half of the payments made before the Preference Period were made 144 or more days after the invoice date. Plaintiff states the pace of payment further accelerated during the Preference Period after Defendant threatened on June 3, 2015 to cut off service to the Debtors. Plaintiff also argues the last three payments the Debtors made to the Defendant prior to the Petition Date were highly unusual – they were for flat amounts ($29,000, $20,000 and $20,000) and paid on account of no particular outstanding invoice, which was completely atypical of the parties' business relationship prior to that point in time.

There is clearly a dispute about whether the Transfers were made in a similar manner and time frame to payments made before the Preference Period. Thus, the Court finds there is a question of fact as to whether the payments were made consistent with prior dealings.

### 2. There is a Dispute Whether the Defendant Engaged in Unusual Collection Activity During the Preference Period

The parties also disagree as to whether the Defendant engaged in unusual collection activities. Whether payments made to a defendant are made in response to unusual collection efforts is a pivotal question. Menotte v. Oxyde Chemicals, Inc. (In re JSL Chem. Corp.), 424 F.R. 573, 581. The fact that payment is made in response to unusual collection practices tends to demonstrate that the transfer was outside the ordinary course of business. *See* In re Accessair, Inc., 314 B.R. 386 (8th Cir. BAP 2004) (payments made in response to threat by creditor to cease

10

providing software support were not made in the ordinary course); In re Gem Const. Corp. of Virginia, 262 B.R. 638 (Bankr. E.D. Va. 2000) (payment was not made in the ordinary course of business of the debtor and creditor because the payment was made in response to the creditor's filing of a mechanic's lien); Watts v. Pride Util. Constr., Inc. (In re Sudco, Inc.), Adv. Pro. No. 05-1134, 2008 Bankr. LEXIS 669, *13 (Bankr. N.D. Ga. Jan. 18, 2008). Courts normally conduct a comparative analysis, looking at collection efforts in both the preference and pre-preference periods, to determine if payments were made in response to unusual collection activity.

For example, in Burtch v. Prudential Real Estate & Relocation Servs. (In re AE Liquidation, Inc.), 729 Fed. Appx. 153 (3rd Cir. 2018), the creditor insisted on a faster payment schedule when it learned the debtor was experiencing financial trouble. The creditor issued an ultimatum to the debtor via email to either increase the weekly payment plan or "bring the account current," and, if not, the creditor would consider terminating the parties' relationship. The debtor then started paying the creditor faster. The Bankruptcy Court found the faster payment rate to be "significant." The Third Circuit upheld the decision finding the ordinary course of business defense did not apply because the creditor's conduct during the preference period deviated from the parties' historical business practices.

Plaintiff contends Defendant escalated its collection during the Preference Period. It states Defendant did not regularly contact the Debtors before the Preference Period but, during the Preference Period, Defendant began involving the Debtor's Chief Financial Officer, Jay Hoffman. For example, on June 3, 2015, Defendant emailed Mr. Hoffman and threatened to suspend dealing with the Debtors unless invoices were brought current. Defendant contends it did not exert unusual pressure on the Debtors and its conduct was not unusual.

11

The parties disagree about whether the Defendant engaged in unusual collection activities. The Court will need to consider evidence of the collection efforts both before and during the Preference Period to determine whether the Transfers were made in response to unusual collection activity by the Defendant. Because the Court cannot determine whether the payments made after the Defendant's collection activity were in the ordinary course of business, the Court finds that there is a genuine factual dispute that precludes summary judgment.

### ii. § 547(c)(2)(C): Ordinary Business Terms (Objective Prong)

Even if transfers fail under the subjective test, a defendant can still prevail—if the debt had been incurred in the ordinary course—by showing the ability to pass the objective test, namely that transfers were made according to "ordinary business terms."

When considering this question, the Court must examine the ordinary standards in the creditor's industry. Miller v. Florida Mining and Materials (In re A.W. & Associates, Inc.), 136 F.3d 1439, 1442 (11th Cir. 1998). Thus, ordinary business terms "refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage." Id. at 1443 (quoting In re Tolona Pizza Products Corp., 3 F.3d 1029, 1032 (7th Cir. 1993)). "[O]nly dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of" the objective test. Id. Put another way, the terms to be ordinary must be "within the range of credit terms that one would consider to be normal." Barrett Dodge Chrysler Plymouth, Inc. v. Cranshaw (In re Issac LeaseCo, Inc.), 389 F.3d 1205 (11th Cir. 2004) (quoting Advo-System, Inc. v. Maxway Corp., 37 F.3d 1044 (4th Cir. 1994)).

Defendant does not address whether the Transfers were made according to ordinary business terms pursuant to section 547(c)(2)(B) and, accordingly, has not established it is entitled to judgment as a matter of law on the objective prong of the ordinary course of business defense.

### b. New Value

Assuming that the ordinary course of business exception applies to some of the Transfers, Defendant asserts that the remaining Transfers fall under the subsequent new value defense. Plaintiff does not dispute that the Defendant's liability on the Transfers is reduced by the new value defense of section 547(c)(4) but contests the extent of the new value.

Creditors can use the subsequent new value defense as a safe haven for certain transfers made during the preference period. Section 547(c)(4) prevents a trustee from avoiding a transfer to a creditor from a debtor

> to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor –
>
> (A) not secured by an otherwise unavoidable security interest; and
>
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C. § 547(c)(4).

"New value" is "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction" that a debtor or trustee cannot void under applicable law. 11 U.S.C. § 547(a)(2). The defense is intended to encourage creditors to work with companies on the verge of insolvency. Miller v. JNJ Logistics, LLC (In re Proliance Int'l, Inc.), 514 B.R. 426, 430 (Bankr. D. Del. 2014). It is also designed to ameliorate the unfairness of allowing the trustee to avoid all payments to a creditor during the preference period without giving any corresponding credit for advances of new value that benefitted the debtor. Id.

Defendant states, after receiving the Transfers, it supplied services to Debtors in the amount of $148,464.10 and contends Plaintiff cannot avoid the Transfers to the extent of this subsequent

13

new value. Plaintiff does not dispute Defendant's liability on the Transfers should be reduced by the new value defense of section 547(c)(4), but it states certain invoices should be prorated based on the dates of service. According to Defendant, even accepting Plaintiff's calculation, the amount of new value is $132,569.11 and potential liability is reduced to $56,350.14. While the parties appear to agree to at least this application of new value, until it is determined whether the debtor's payments to a creditor are otherwise avoidable, the exact amount subject to the subsequent new value defense cannot be determined. Wahoski v. Am. & Efrid, Inc. (In re Pillowtex Corp.), 416 B.R. 123, 131 (Bankr. D. Del. 2009). Thus, it is appropriate to deny summary judgment as to the new value defense until the court determines whether the ordinary course of business defense applies. *See e.g.,* Stanziale v. Superior Techs. Res., Inc. (In re Powerwave Techs.), Nos. 13-10134 (MFW), 15-50085 (MFW), 2017 Bankr. LEXIS 1023, at *24 (Bankr. D. Del. Apr. 13, 2017).

### IV. CONCLUSION

For the reasons stated above, the Court finds disputed issues of fact remain including whether the Transfers were made in a similar manner to transfers made prior to the Preference Period, whether the Transfers were made in response to unusual collection activity, and the extent to which the Defendant provided new value to the Debtors after the Transfers. Accordingly, summary judgment is not warranted pursuant to section 547(c)(2)(B) and 547(c)(4).

**IT IS ORDERED** that the Motion is **DENIED**.

The Clerk's Office is directed to serve a copy of this Order on Plaintiff, Plaintiff's counsel, Defendant, Defendant's counsel, and the United States Trustee.

**END OF DOCUMENT**